UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

    - v. -                         :          **SEALED INFORMATION**

CHRISTOPHER PLAFORD,              :

      Defendant.                  :

- - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

16 CRIM (RA) 400

### COUNT ONE
(Conspiracy to Commit Securities Fraud and Wire Fraud)

The United States Attorney charges:

#### Relevant Individuals and Entities

1.  At certain times relevant to this Information,
Investment Advisor-A was a registered investment advisor with
the U.S. Securities and Exchange Commission ("SEC"). Investment
Advisor-A managed approximately $7.8 billion in a range of
investments for clients. Until September 2013, Investment
Advisor-A managed six active hedge funds. From in or about 2009
until on or about September 30, 2013, Investment Advisor-A
maintained a hedge fund that invested primarily in debt
instruments issued by healthcare companies ("Fund-1").
Investment Advisor-A also maintained a long-short equity hedge
fund focused on healthcare stocks ("Fund-2"). Investment
Advisor-A's primary place of business was New York, New York.

2.     CHRISTOPHER PLAFORD, the defendant, served as a partner in Investment Advisor-A and as Fund-1's portfolio manager from its inception in or about May 2009 through its liquidation.  As portfolio manager, PLAFORD directed the majority of Fund-1's investments.  PLAFORD was employed at Investment Advisor-A until in or about December 2013.

3.     CHRISTOPHER PLAFORD, the defendant, supervised a co-conspirator not named as a defendant herein ("CC-1") from in or about May 2009 through in or about April 2013.  CC-1 was the Fund-1 Portfolio Manager for Special Situations and was employed at Investment Advisor-A until in or about April 2013.

4.     At certain times relevant to this Information, CHRISTOPHER PLAFORD, the defendant, supervised another individual ("CW-1") who worked as a trader for Fund-1 between approximately 2011 and 2013.

5.     At all times relevant to this Information, CHRISTOPHER PLAFORD, the defendant, CC-1, and CW-1 had business relationships with a number of broker-dealers that executed trades for Fund-1 and worked with, among others, two particular brokers (herein "Broker-1" and "Broker-2," respectively), to calculate the net asset value ("NAV") of Fund-1 at the end of each month.  Broker-1 and Broker-2 worked at two different companies, both registered as broker-dealers with the SEC and both located in New York, New York.

2

### The Scheme to Defraud

6.   From at least in or about 2011 through at least in or about September 2013, CHRISTOPHER PLAFORD, the defendant, CC-1, CW-1, and others known and unknown, participated in a scheme to defraud Fund-1 investors and potential investors by deceptively mismarking each month the value of certain securities held by Fund-1, thereby misrepresenting the liquidity of the mismarked bonds.   The objective of the scheme was to inflate Fund-1's NAV, which was a calculation of Fund-1's total value determined by the approximate market value of each of its assets minus its liabilities.   Investment Advisor-A assessed performance fees each year based on Fund-1's profits and losses. PLAFORD's mismarking was in violation of Investment Advisor-A's internal valuation procedures and contrary to Investment Advisor-A's representations to investors.   The effect of the scheme was to overstate both Fund-1's liquidity and its NAV, which resulted in higher payments from investors to Investment Advisor-A and, ultimately, to PLAFORD, among others.

### Means and Methods Of The Conspiracy

7.   Among the means and methods by which the conspirators, including CHRISTOPHER PLAFORD, the defendant, would and did carry out the conspiracy were the following:

a.   To support their fraudulent pricing of certain bonds, PLAFORD and others obtained sham broker quotes

that were supposed to reflect price ranges at which third-party brokers believed there was a genuine market to buy or sell a security or other asset held by Fund-1.  In truth and in fact, PLAFORD and CC-1 fraudulently selected prices for their month-end valuations and then instructed brokers to parrot those prices back to PLAFORD and CC-1.

        b.    To further deceive investors and to mask the illiquidity of certain bonds, PLAFORD and others caused certain bonds to be misclassified as more liquid than they actually were, which misclassification was contrary to relevant accounting principles and internal policies of Investment Advisor-A.

        c.    To further inflate Fund-1's month-end NAV, PLAFORD and others purchased bonds above their prevailing market price, for the purpose of causing the prices of those bonds to be marked at values greater than what they actually were worth.

<u>Statutory Allegation</u>

        8.    From at least in or about June 2011 through in or about September 2013, in the Southern District of New York and elsewhere, CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and

78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and wire fraud, in violation of Title 18, United States Code, Section 1343.

9. It was a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative, and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

10. It was further a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for

obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Act

11.   In furtherance of the conspiracy and to effect its illegal object, CHRISTOPHER PLAFORD, the defendant, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a.   On or about July 1, 2011, PLAFORD emailed CW-1 a list of certain bonds, loans, and other positions held in Fund-1 for the month ending June 30, 2011.

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Securities Fraud)

The United States Attorney further charges:

12.   The allegations contained in paragraphs 1 through 7 and 11 of this Information are repeated and realleged as if fully set forth herein.

13.   From at least in or about June 2011 through in or about September 2013, in the Southern District of New York and

6

elsewhere, CHRISTOPHER PLAFORD, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, PLAFORD made, and caused to be made, false and misleading representations and omissions to current and prospective investors regarding Fund-1's NAV, including by soliciting inflated broker quotes, causing certain bonds to be misclassified in order to mask those bonds' illiquidity from investors, and paying inflated prices for certain bonds at month's end.

(Title 15, United States Code, Sections 78j(b) & 78ff; and
Title 18, United States Code, Section 2.)

7

## COUNT THREE
(Conspiracy to Defraud the United States and to
Convert Property of the United States)

The United States Attorney further charges:

### Relevant Individuals and Entities

14.   The allegations contained in paragraphs 1 and 2 of this Information are repeated and realleged as if fully set forth herein.

15.   From at least in about 2011 through in or about September 2013, Investment Advisor-A retained a co-conspirator not named as a defendant herein ("CC-2") as a consultant who, in exchange for a monthly consulting fee, provided "political intelligence," which included an analysis of federal agency decision-making with respect to, among other topics, how changes in Government-provided insurance coverage and reimbursement rates would impact publicly traded healthcare-related companies. Prior to joining the private sector, CC-2 had worked as a Special Assistant and Healthcare Specialist at the Centers for Medicaid and Medicare Services ("CMS").

16.   At all times relevant to this Information, CMS was a federal agency within the U.S. Department of Health and Human Services that administered the Medicare program and worked in partnership with state governments to administer Medicaid. CMS was charged with, among other things, determining the rate at which Medicare and Medicaid would reimburse medical providers

8

or suppliers for covered products, services, and treatments. CMS regularly adjusted reimbursement rates applicable to each product, service, and treatment.  CMS's decisions regarding how much it would pay providers and suppliers had a material financial impact on many healthcare and insurance companies. Each year, CMS typically issued a proposed rule, and thereafter a final rule, which included a fee schedule setting CMS's reimbursement rates for the following calendar year.

17.  At all times relevant to this Information, CC-2 maintained regular contact with, among other people, current CMS employees who improperly divulged confidential and material non-public information to CC-2.

18.  At all times relevant to this Information, and as set forth in Investment Advisor-A's compliance manuals, Investment Advisor-A forbade "insider trading," that is, "any employee from trading, either personally or on behalf of others, ... on material non-public information or communicating material non-public information to others in violation of the law."

19.  At all times relevant to this Information, CMS employees were prohibited from disclosing non-public information that they learned in the course of their employment at CMS to individuals outside the agency, unless such disclosure was authorized by law.  That prohibition recognized that the disclosure of such information could affect bond and stock

markets.  CMS employees also were subject to the Standards of
Ethical Conduct for Employees of the Executive Branch, as
codified in the Code of Federal Regulations, which prohibited
improperly using non-public information to further private
interests.

### The Scheme to Defraud

20.  From at least in or about 2011 through at least
in or about September 2013, CHRISTOPHER PLAFORD, the defendant,
CC-2, and others known and unknown, participated in a scheme to
obtain and convert to their own use material non-public
information from CMS concerning, among other things, internal
deliberations and upcoming actions of CMS regarding the
reimbursement for and coverage of certain products and services.
PLAFORD obtained this valuable information from CC-2 and used it
to direct that a series of securities trades be executed.

### Statutory Allegation

21.  From in or about 2011 through in or about 2013,
CHRISTOPHER PLAFORD, the defendant, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to defraud
the United States and an agency thereof, to wit, CMS, and to
commit an offense against the United States, to wit, conversion
of property of the United States, in violation of Title 18,
United States Code, Section 641.

22.   It was a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly would and did defraud the United States and CMS by obtaining confidential information from CC-2 that was disclosed to CC-2 by a CMS employee in violation of CMS's prohibition on disclosing non-public information outside CMS, thereby obstructing the lawful function of CMS. 5 C.F.R. § 2635.703(a).

23.   It was further a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, knowingly would and did embezzle, steal, purloin, and convert to their use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1000, and would and did receive, conceal, and retain the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined and converted, in violation of Title 18, United States Code, Section 641.

### Overt Act

24.   In furtherance of the conspiracy and to effect its illegal objects, CHRISTOPHER PLAFORD, the defendant, committed the following overt act, among others, in the Southern District of New York and elsewhere:

11

a.    In or about June 2013, PLAFORD received confidential information from CC-2 about impending decisions by CMS.

(Title 18, United States Code, Section 371.)

### COUNT FOUR
(Conversion of Property of the United States)

The United States Attorney further charges:

25.    The allegations contained in paragraphs 1 and 2, 15 through 20, and 24 of this Information are repeated and realleged as if fully set forth herein.

26.    From at least in or about 2011 up to and including in or about 2013, in the Southern District of New York and elsewhere, CHRISTOPHER PLAFORD, the defendant, knowingly embezzled, stole, purloined, and converted to his use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1000, and received, concealed, and retained the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, PLAFORD received from CC-2 confidential information about impending CMS decisions, which PLAFORD knew had been obtained from CMS insiders, and used the information to purchase and sell securities in Fund-1.

(Title 18, United States Code, Sections 641 and 2.)

12

## COUNT FIVE

(Conspiracy to Convert United States Property, to Commit
Securities Fraud, and to Defraud the United States)

The United States Attorney further charges:

### Relevant Individuals and Entities

27.   The allegations contained in paragraphs 1 and 2
of this Information are repeated and realleged as if fully set
forth herein.

28.   From at least in about 2005 through in or about
2011, Investment Advisor-A retained a co-conspirator not named
as a defendant herein ("CC-3") as a consultant who, in exchange
for a monthly consulting fee, provided "political intelligence"
related to, among other things, the likelihood and timing of the
United States Food and Drug Administration's ("FDA") approval of
Abbreviated New Drug Applications ("ANDAs"), which are
applications drug companies must submit to the FDA to obtain
approval to sell generic versions of brand name drugs.   CC-3 had
previously served as the Deputy Director of the FDA's Office of
Generic Drugs ("OGD").

29.   At all times relevant to this Information, the
FDA was a federal agency within the U.S. Department of Health
and Human Services that was responsible for protecting the
public health by, among other things, ensuring that drugs
intended for human use were safe and effective.   OGD was an
office within the FDA charged with, among other things,

13

approving a pharmaceutical company's ability to sell a generic drug in the United States.  The FDA's decision to approve a generic drug typically has a positive impact on the stock price of the company receiving approval, and a negative impact on the stock price of the company producing the brand name drug.

30.  At all times relevant to this Information, the FDA's evaluation of ANDAs was confidential information.  The FDA did not disclose when, if ever, an ANDA would be approved nor did the FDA disclose the status of its deliberations about an ANDA.  The protection of this confidential information was central to one of the FDA's core missions: the efficient approval of generic drugs.

31.  At all times relevant to this Information, FDA employees were prohibited from disclosing non-public information that they learned in the course of their employment at the FDA to individuals outside the FDA, unless such disclosure was authorized by law.  That prohibition recognized that the disclosure of such information could affect bond and stock markets.  FDA employees also were subject to the Standards of Ethical Conduct for Employees of the Executive Branch, as codified in the Code of Federal Regulations, which prohibited improperly using non-public information to further private interests.

14

32. At all times relevant to this Information, a co-conspirator not named as a defendant herein ("CC-4") served as a partner in Investment Advisor-A and one of Fund-1's portfolio managers, managing the specialty pharmaceuticals portfolio within Fund-1 (the "Specialty Pharmaceuticals Portfolio"). As portfolio manager, CC-4 had sole decision making authority for investments in the Specialty Pharmaceuticals Portfolio.

33. At all times relevant to this Information, Individual-1 was a senior official at OGD. In this position, Individual-1 had access to confidential FDA information about, among other things, the FDA's internal deliberations about the timing and likelihood of the FDA's approval of generic drugs.

34. At all times relevant to this Information, Momenta Pharmaceuticals, Inc. ("Momenta") was a corporation headquartered in Cambridge, Massachusetts. Momenta's stock traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") and was listed under the ticker symbol "MNTA."

35. At all times relevant to this Information, Sanofi-Aventis S.A. ("Sanofi") was a corporation headquartered in France. Sanofi's stock traded on the New York Stock Exchange ("NYSE") through the issuance of American Depository Receipts ("ADRs") under the ticker symbol "SNY." Sanofi's stock also traded on the Euronext Paris stock exchange.

15

## The Scheme to Defraud

36.   From at least in or about 2005 through at least
in or about January 2011, CHRISTOPHER PLAFORD, the defendant,
CC-3, CC-4, and others known and unknown, participated in a
scheme to obtain and convert to their own use confidential and
material non-public information from the FDA concerning, among
other things, the FDA's internal deliberations regarding the
approval of certain ANDAs.

37.   As a part of the scheme, CC-3 improperly obtained
confidential and material non-public information from
Individual-1, among other FDA employees, and then provided it to
CC-4, who used the information to purchase and sell securities
in Fund-2.   At times, CC-4 provided to CHRISTOPHER PLAFORD, the
defendant, the confidential information obtained from CC-3,
which PLAFORD also used to purchase and sell securities in Fund-
1, knowing that the information came from an FDA insider.

38.   As a further part of the scheme, and as
CHRISTOPHER PLAFORD, the defendant, well knew, CC-4 caused
Investment Advisor-A to make monthly consulting payments to CC-3
in exchange, in part, for the confidential and material non-
public information that CC-3 improperly obtained from
Individual-1.

16

## The Enoxaparin ANDA Approval

39.   For example, CC-3 improperly obtained confidential and material non-public information concerning the FDA's approval of a generic version of an anticoagulant drug called enoxaparin.   Beginning in the mid-1990s, Sanofi manufactured and sold enoxaparin under the brand name Lovenox. In 2005, a publicly traded pharmaceutical company that was partnered with Momenta filed an ANDA to sell a generic version of Lovenox (the "Momenta ANDA").   At the time that the Momenta ANDA was filed, two other publicly traded pharmaceutical companies had ANDAs pending for generic Lovenox, which had been filed in June 2003.

40.   On or about July 23, 2010, the FDA approved the Momenta ANDA.   This approval was positive news for Momenta, as Momenta was the first company to receive approval to sell generic Lovenox.   In addition, at the time it received the FDA's approval, Momenta had developed only one other drug, which rendered Momenta's future financial performance highly contingent on whether Momenta received generic Lovenox approval. Accordingly, when the FDA announced its approval of the Momenta ANDA on or about July 23, 2010, Momenta's stock price increased nearly 100 percent.

41.   The approval of the Momenta ANDA on or about July 23, 2010 was negative news for Sanofi, which no longer had a

monopoly on the drug.  As a result, on or about July 23, 2010, the price of Sanofi's ADRs declined.

42.  Before the FDA approved the Momenta ANDA on or about July 23, 2010, OGD personnel, including Individual-1, had regular meetings regarding the progress of the Momenta ANDA and the timing, if any, of the FDA's approval.  As part of this process, the FDA maintained an internal document tracking the progress of ANDAs, including the Momenta ANDA, and estimating the likelihood of their approval (the "Tracking Document").  The information contained in the Tracking Document was highly confidential and not intended to be disclosed to anyone outside of the FDA.  Individual-1 had access to the Tracking Document in the course of his employment.

43.  Beginning at least in or about 2008, CC-3 improperly obtained from Individual-1 confidential and material non-public information about the status of the approval of a generic Lovenox ANDA, including information from the Tracking Document.  Among other pieces of information, in or about late 2009 or early 2010, CC-3 told CC-4, in sum and substance, that the Tracking Document reflected the movement of a generic Lovenox toward approval.

44.  After obtaining this information from CC-3, CC-4 used it to amass a long position in Momenta stock valued at approximately $35 million, and a short position in both Sanofi's

18

European-traded stock and U.S.-traded ADRs, together valued at approximately $78 million.

45.   CC-4 also passed the information obtained from CC-3 to CHRISTOPHER PLAFORD, the defendant, so that PLAFORD could execute securities trades in Fund-1.   PLAFORD knew that CC-4 had obtained the confidential information from CC-3, who, in turn, had obtained it from an FDA insider.   Based in part on this information, in or around January 2010, PLAFORD instructed a subordinate to research Sanofi credit default swaps ("CDSs") in anticipation of a generic Lovenox approval and thereafter, beginning in or about March 2010, caused Fund-1 to purchase at least five million Sanofi CDSs.   These CDSs, which were a form of insurance against the risk that Sanofi would default on its debt, stood to increase in price when a generic Lovenox ANDA was approved.

### Statutory Allegation

46.   From at least in or about 2005 through at least in or about January 2011, CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, conversion of property of the United States, in violation of Title 18, United States Code, Section 641, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and

19

78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and to defraud the United States and an agency thereof, to wit, the FDA.

47.   It was a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, knowingly would and did embezzle, steal, purloin, and convert to their use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, the FDA, the value of which exceeded the sum of $1000, and would and did receive, conceal, and retain the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined, and converted, in violation of Title 18, United States Code, Section 641.

48.   It was further a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by (a) employing devices, schemes, and

20

artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

49.   It was further a part and an object of the conspiracy that CHRISTOPHER PLAFORD, the defendant, and others known and unknown, willfully and knowingly, using deceit, craft, trickery and dishonest means, would and did defraud the United States and the FDA by obtaining confidential information about the FDA's internal deliberations related to generic drug approvals, thereby impeding, impairing, defeating and obstructing the lawful function of the agency, in violation of Title 18, United States Code, Section 371.   5 C.F.R. § 2635.703(a).

<div align="center">Overt Acts</div>

50.   In furtherance of the conspiracy and to effect its illegal objects, CHRISTOPER PLAFORD, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

<div align="center">21</div>

a.    On or about January 7, 2010, CC-4 purchased Momenta securities.

b.    On or about January 14, 2010, CC-4 sold short Sanofi securities.

c.    On or about January 22, 2010, PLAFORD instructed a subordinate to research Sanofi CDSs in anticipation of a generic Lovenox approval.

d.    On or about January 9, 2011, CC-3 requested payment for his FDA consulting services.

(Title 18, United States Code, Section 371.)

### COUNT SIX
(Securities Fraud)

The United States Attorney further charges:

51.    The allegations contained in paragraphs 1 and 2, 28 through 45, and 50 of this Information are repeated and realleged as if fully set forth herein.

52.    From at least in or about 2009 through at least in or about July 2010, in the Southern District of New York and elsewhere, CHRISTOPHER PLAFORD, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances,

22

in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, based on material non-public information about the FDA's internal deliberations regarding the approval of generic Lovenox improperly obtained by CC-3 and provided to CC-4, who then provided it to PLAFORD, PLAFORD caused Fund-1 to purchase CDSs of Sanofi.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and Title 18, United States Code, Section 2.)

### COUNT SEVEN
(Conspiracy to Commit Wire Fraud)

The United States Attorney further charges:

53.  The allegations contained in paragraphs 1 and 2, 28 through 45, and 50 of this Information are repeated and realleged as if fully set forth herein.

54.  From at least in or about 2005 through at least in or about January 2011, in the Southern District of New York and elsewhere, CHRISTOPHER PLAFORD, the defendant, and others

known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

55.   It was a part and an object of the conspiracy
that CHRISTOPHER PLAFORD, the defendant, and others known and
unknown, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATION

56.   As a result of committing one or more of the
offenses alleged in Counts One through Seven of this
Information, CHRISTOPHER PLAFORD, the defendant, shall forfeit
to the United States pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code Section
2461, any property, real or personal, which constitutes or is
derived from proceeds traceable to the commission of the

24

offenses alleged in Counts One through Seven of this
Information.

<div align="center">Substitute Assets Provision</div>

57.    If any of the above-described forfeitable
property, as a result of any act or omission of CHRISTOPHER
PLAFORD, the defendant,

a.    cannot be located upon the exercise of due
diligence;

b.    has been transferred or sold to, or
deposited with, a third party;

c.    has been placed beyond the jurisdiction of
the court;

d.    has been substantially diminished in value;
or

e.    has been commingled with other property
which cannot be divided without difficulty,
it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code Section 2461, to seek forfeiture of any other property of

PLAFORD up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)


*Preet Bharara*

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**- v. -**

**CHRISTOPHER PLAFORD,**

Defendant.

---

**SEALED INFORMATION**

16 Cr. _____ (RA)

(15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R.
§ 240.10b-5 & § 240.10b5-2;
18 U.S.C. §§ 371, 641, 1343, 1349 & 2.)

PREET BHARARA
United States Attorney

---